In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-3825

EDWARD F. BRENNAN,

*Plaintiff-Appellant,*

*v.*

JAMES S. CONNORS,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:10-cv-00517—**G. Patrick Murphy**, *Judge.*

ARGUED MAY 12, 2011—DECIDED JUNE 30, 2011

Before BAUER, FLAUM, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Jimmy Connors is known throughout the tennis world for many things: his fierce two-handed backhand, his numerous Grand Slam singles titles (eight, on three different surfaces), and his fiery competitive spirit, to name just a few. In addition to holding the men's number one world ranking for 160 consecutive weeks (1974-77), he is known for his longevity, performing well later in his career against players like

Björn Borg, John McEnroe, and Ivan Lendl and reaching the semifinals of the 1991 U.S. Open at the age of 39.[1] More recently, Connors has been engaged in an equally long-running battle off the court—or rather, in court—against his former attorney, Edward Brennan.

Brennan first sued Connors in 1998 for allegedly failing to transfer shares of a gaming company to Brennan pursuant to their representation agreement. The suit was settled eleven years later in 2009. But after Brennan was accused by his former law partner, Michael Constance, of cheating him out of a portion of the shares, Brennan sued Connors again, this time claiming that, if Brennan is found liable to Constance, Connors must indemnify Brennan pursuant to their settlement agreement. The district judge granted Connors' motion to dismiss, finding that the indemnity provision in the settlement agreement failed by its terms and that, in any event, Illinois public policy would not permit indemnification under these facts. Brennan now appeals.

In 1992, Brennan, then a partner in the Belleville, Illinois, law firm Brennan, Cates & Constance, P.C., agreed to represent Connors in, among other things, "all present and

---

[1] In the fourth round, Connors defeated a 24-year-old, Aaron Krickstein, 3–6, 7–6, 1–6, 6–3, 7–6 in 4 hours and 41 minutes, coming back from a 2–5 deficit in the final set. Connors also had to rally back to win his quarterfinal match against Paul Haarhuis, who had upset the number one seed, Boris Becker. Connors was defeated by Jim Courier in straight sets in the semifinals. Courier then lost in straight sets to Stefan Edberg in the finals.

future contracts."[2] In 1997, the firm dissolved. The following year, Brennan sued Connors in Illinois state court, alleging that Connors had unilaterally terminated the representation agreement without fulfilling his obligation under the agreement to transfer shares of Argosy Gaming Co. (an Alton, Illinois, casino operator later acquired by Penn National Gaming, Inc.) to Brennan.[3]

Eleven years later, the suit was settled for a payment by Connors of $10.5 million to Brennan. The settlement agreement contained an indemnification clause that said:

> [Brennan] and [Connors] warrant that they are the sole owners of the rights asserted in the present lawsuit, and that they have made no assignment of any of these rights. [Brennan] further declare[s] that [he] will hold harmless and indemnify [Connors] from any and all costs, fees, liabilities and losses which might be incurred by [Connors] as a result of any outstanding liens, or any other claims by any other party, including, but not limited to, claims by former partners or shareholders or any current partner or shareholder *regarding the contract referenced in the Complaint or rights of reimbursements arising out of the allegations in [Brennan's]*

---

[2] The representation agreement also provided for legal services for Connors' mother, Gloria, and their company, Tennis Management, Inc.

[3] The plaintiffs in that case were actually Brennan and his law firm, and the defendants were Connors, Gloria, and Tennis Management, Inc. Our case only concerns Brennan and Connors, so we will ignore the other parties going forward.

*Complaint.* [Connors] further declare[s] that [he] will hold harmless and indemnify [Brennan] from any and all costs, fees, including any and all liabilities and losses which might be incurred by [Brennan] as a result of any outstanding liens, or any other claims by any other party, including, but not limited to, claims by former partners or shareholders or any current partner or shareholder, *regarding the contract referenced in the Complaint or rights of reimbursement arising out of [Connors'] Counterclaims or Affirmative Defenses.*

(Emphasis added.) The ceasefire didn't last long. In 2010, Constance sued Brennan, claiming that Brennan engaged in fraud and breach of fiduciary duty by deliberately refusing to accept the Argosy shares from Connors in 1997 before the firm dissolved and by concealing Connors' attempted transfer from Constance. Constance further alleged that he waived any interest he may have had in the shares in reliance on Brennan's misrepresentations and omissions. Brennan, in turn, sued Connors, seeking a declaration that the settlement agreement entitles Brennan to indemnification from Connors if Brennan is found liable to Constance.[4]

---

[4] The procedural posture of these cases is as messy as the allegations. Brennan was instructed to bring his indemnification action as a third-party claim in the Constance case, which was originally filed in state court but removed by Brennan to federal court based on alleged diversity of citizenship. Brennan ignored the instructions and filed a separate action that was then consolidated with the Constance case. But the matters were

(continued...)

The district judge subsequently ordered Brennan to show cause why the case should not be dismissed because indemnification agreements for intentional misconduct violate Illinois public policy. Connors then filed a motion to dismiss, or, in the alternative, for summary judgment, along the same lines. The district judge granted the motion to dismiss[5] on three grounds: (1) the indemnity provision created an "infinitely repeating loop" of liability and therefore failed by its terms; (2) Illinois public policy generally prohibits contractual indemnification for intentional misconduct; and (3) the indemnity provision was not specific enough to exempt it from the general rule.

We begin our *de novo* review with the language of the settlement agreement. The district judge found that the indemnification provision failed because it locked the parties in an infinitely repeating loop of liability: under the third sentence, Connors must indemnify Brennan for Constance's claim, but then, under the second sentence, Brennan must indemnify Connors for the costs resulting from Connors indemnifying Brennan. Brennan argues that this interpretation is "absurd" (a term used profusely

---

(...continued)

separated again when the district judge determined that diversity did not exist between Brennan and Constance. So, the Constance case is now back in state court where it started.

[5]   The district judge found it unnecessary to treat Connors' motion as a motion for summary judgment because the settlement agreement was attached to Brennan's complaint, and the previous litigation between the parties was judicially noticeable.

by both parties). He maintains that a claim by Connors for indemnification from Brennan in the situation we just described would be a claim regarding the indemnity agreement itself, not "regarding the contract referenced in the Complaint."

There is no support for this interpretation in the agreement. The indemnification language is the same for both parties, so if "regarding the contract referenced in the Complaint" is broad enough to cover Brennan's claim for indemnification from Connors, it would also cover Connors' subsequent claim for indemnification from Brennan.

Moreover, Connors has proposed a much more sensible interpretation of the provision: the mutual indemnities in the second and third sentences relate to the "warrant" of sole ownership of the rights asserted in the first sentence. That is, the parties only agreed to indemnify each other from claims that they could have assigned to someone else. For example, if someone, let's call him Steve Epstein, made a demand on Brennan for legal services under the representation agreement, Brennan would be entitled to indemnification from Connors because Connors warranted that he was the sole owner of those rights. Likewise, if Epstein made a demand on Connors for compensation under the representation agreement, Connors would be entitled to indemnification from Brennan.

Here, Constance is not suing Brennan based on an assertion of rights under the representation agreement. Rather, Constance is alleging that he relinquished any

rights he may have had under the agreement because of Brennan's wilful deceit. Thus, Constance's claim is not "regarding the contract," and the indemnification provision does not apply. This interpretation is undoubtedly the more logical, as it is hard—if not impossible—to imagine why Connors would have agreed to indemnify Brennan for deliberately cheating his law partner out of a firm asset.

Even if we credited Brennan's interpretation, the indemnification provision would still fail. As the astute district judge correctly noted, in Illinois, agreements to indemnify against intentional misconduct generally are void as against public policy and unenforceable. *Davis v. Commonwealth Edison Co.*, 336 N.E.2d 881, 885 (Ill. 1975). There are at least two exceptions: (1) Illinois law permits insurance agreements against intentional misconduct when the beneficiary of the proceeds is not the wrongdoer, *see Dixon Distributing Co. v. Hanover Insurance Co.*, 641 N.E.2d 395, 401 (Ill. 1994); and (2) Illinois law permits agreements to be construed as indemnifying a person against his own negligence (and perhaps intentional misconduct) when supported by clear and explicit language, *see Westinghouse Electric Elevator Co. v. La Salle Monroe Building Corp.*, 70 N.E.2d 604, 607 (Ill. 1946).

In *Chicago Housing Authority v. Federal Security, Inc.*, 161 F.3d 485 (7th Cir. 1998), we applied these principles to a case involving a shooting by two FSI security guards Working under contract for CHA. The contract obligated FSI to indemnify CHA "against any liability or expense . . . arising out of any losses, claims, damages or injury resulting from any intentional acts or any negligent

acts or omissions of [FSI] . . . ." *Id.* at 487. We first cited the *Westinghouse* rule and found that the language of the agreement was broad enough and explicit enough to permit CHA's claim of indemnification from FSI for CHA's own negligence. We then considered CHA's claim of indemnification from FSI for CHA's intentional acts. There, we cited the *Davis* rule but found it inapplicable because we faced an entirely different factual setting—that is, enforcing the indemnification contract against FSI would merely "requir[e] the primary wrongdoer to bear the financial burden of its actions." *Id.* at 489. We therefore concluded that FSI was required to indemnify CHA.

Brennan's primary contention is not that either of the two recognized exceptions to the *Davis* rule applies, or even that the situation resembles the one in *Chicago Housing Authority* (indeed, the Constance complaint attributes no blame to Connors). Rather, he argues that indemnity agreements for *future* conduct are distinct from indemnity agreements for *past* conduct and that the latter agreements, such as the one at issue here, are not against public policy. *See generally* 8 Williston on Contracts § 19:18 (4th ed. 2010) ("A contract to indemnify against the consequences of an act that has already been committed has also been generally upheld . . . .").

The problem is that this past-versus-future distinction and categorization of indemnity agreements has no support in Illinois law. In fact, the Illinois Supreme Court has stated that "it serves no useful purpose to attempt to analyze or reconcile the numerous cases interpreting

indemnity clauses since each individual case depends upon the particular language used and the factual setting of the case." *Buenz v. Frontline Transportation Co.*, 882 N.E.2d 525, 530 (Ill. 2008) (internal citation omitted). Accordingly, our best guess is that Illinois would reject Brennan's argument and apply the *Davis* rule.

   In sum, the indemnity provision does not apply to this matter, and even if it did, we would find it unenforceable under Illinois public policy. Game, set, and match to Connors. The judgment of the district court is AFFIRMED.